IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| **In re:** )<br>)<br>**DEBORAH FAYE PARKER,** )<br>Debtor. )<br>_____ )<br>)<br>**DEBORAH FAYE PARKER,** )<br>Defendant-Appellant, )<br>)<br>v. )<br>)<br>**DAN GREGORY MARTIN,** )<br>Plaintiff-Appellee. ) | Case No. 1:22-cv-1388 |

### MEMORANDUM OPINION

At issue in this bankruptcy appeal is whether the bankruptcy court erred in concluding that Plaintiff-Appellee Dan Gregory Martin's $150,000 state court unjust enrichment judgment against Defendant-Appellant Deborah Faye Parker is non-dischargeable in bankruptcy as a "debt … for … embezzlement." 11 U.S.C. § 523(a)(4). Parker contends on appeal that there is no record evidence to support the bankruptcy court's conclusion that Parker embezzled the money underlying Martin's judgment. The matter has been fully briefed and argued, and it is now ripe for disposition.

I.

The following facts and proceedings are derived from the record in this case:

- Defendant-Appellant Deborah Faye Parker resides in Stafford County, Virginia. Parker is the daughter of Morton H. Poindexter, Jr.

- Plaintiff-Appellee Dan Gregory Martin resides in Roanoke, Virginia. Martin is the son of Peggy L. Martin.

- Parker and Martin are not related by blood, but their parents, Morton and Peggy, cohabited for many years in Roanoke County, Virginia. Morton and Peggy never married.

1

- On April 13, 2004, Morton and Peggy entered into a contractual agreement. Despite never marrying, Morton and Peggy chose to label their contract a Post Marital Agreement ("PMA").[1] Notwithstanding its odd title, the PMA was in substance a contract to execute mutual and reciprocal wills. The PMA required the following procedure:
    - Morton and Peggy would designate each other's children as beneficiaries of their respective estates.
    - Whichever of Morton and Peggy would die first would pass their entire estate to the other.
    - The surviving party would not give more than $1,500 per year to that surviving party's children.
    - When the surviving party thereafter passed, two thirds of the combined estate would go to Martin, and the remaining third would go to Morton's three children *per stirpes*. Put differently, Parker was entitled to one ninth of the combined estate.
- The same day that Morton and Peggy executed the PMA (*i.e.*, May 13, 2004), they also executed reciprocal and irrevocable wills that implemented the PMA's terms.
- Peggy died in April 2009, and, as the PMA required, all her assets passed to Morton. After Peggy's death, Morton transferred approximately $240,000 of his financial assets to Parker (collectively referred to as the "Funds"). Specifically, Morton made the following transfers to Parker after Peggy's death:
    - Morton designated Parker as the primary beneficiary of an annuity worth $111,622 that Morton held with Symetra Financial via SunTrust Investment Services. Plaintiff's Motion for Summary Judgment at 3, *Martin v. Parker*, No. CL-14-702 (Va. Cir. Ct. Roanoke Cty. May 8, 2019) (hereinafter "*Martin v. Parker* (State Action)").[2]
    - Morton named Parker as the beneficiary of an annuity worth $25,201 that Morton held with Transamerica Life Insurance Co. *Id.*

---

1   The text of the PMA was not before the bankruptcy court because the PMA itself was not admitted into evidence. *See* Supplemental Appendix to Appellee's Response Brief at 15 (Dkt. 6-1) (hereinafter "R.3"); Order Designating Supplemental Record on Appeal (Dkt. 12). However, Parker admitted to the essential terms of the PMA in her answer to Martin's complaint in this matter. *See* Record on Appeal, Vol. 1 at 25, 37 (Dkt. 3-2) (hereinafter "R.1").

2   Judicial notice of the filings that were submitted in Martin's Virginia lawsuit is appropriate, since the existence and contents of the filings, as entered on the docket of the Circuit Court for Roanoke County, Virginia, constitute facts that are "not subject to reasonable dispute." Fed. R. Evid. 201(b). To the extent there are any facts asserted in the cited pleadings that might reasonably be disputed, a close review of the record reveals no dispute between the parties.

- - Morton named Parker and her two brothers as beneficiaries of a life insurance policy that Morton held with the Virginia Retirement System, resulting in Parker receiving $5,014.58 upon Morton's death. *Id.*
  - Morton added Parker as a joint holder of (i) a checking account worth $69,377.25 and (ii) a certificate of deposit worth $8,012.11 that Morton held at SunTrust Bank. Morton also gave Parker a second SunTrust certificate of deposit worth $8,026.53. *Id.* at 4.
- Morton died in August 2013. Martin was appointed executor of Morton's estate, as Morton's will directed.
- Parker retrieved Morton's will several days before Morton's death. While Parker was "dealing with losing [her] father," Martin called Parker and "advised her" that Morton and Peggy had executed the PMA. (R.3 at 59; R.2 at 74). When Parker read through Morton's will, she discovered that Martin had been given two thirds of Morton's estate. (R.3 at 59).
- After reading Morton's will, Parker became, in her words, "confused." *Id.* Specifically, Parker was uncertain whether the Funds, which Morton had transferred to Parker before his death, were (i) part of Morton's estate and thus two thirds Martin's or (ii) Parker's personal property and thus entirely Parker's. *Id.* at 59–60.
- According to Parker's unrebutted testimony at trial, Parker then contacted her bank and said, "I've got a will and the post-marital." *Id.* at 60. Parker's bankers "basically said, sorry, he—he gave you—you his money when he was alive, and [Morton's *inter vivos* gift] supersedes [Morton's will]." *Id.*
- Parker thereafter had a conversation with Symetra, the issuer of the largest annuity Parker had been given. At the end of that conversation, Parker concluded that the money in the Symetra annuity was hers. Parker also called the issuer of Morton's life insurance policy to ascertain whether she was entitled to receive the benefit of that policy. After that conversation, Parker concluded that the benefit of that policy belonged to her as the named beneficiary. Finally, Parker spoke to SunTrust Bank to determine if she had lawful possession of Morton's accounts there. After that conversation, too, Parker concluded the SunTrust accounts were legally hers.
- Martin objected and told Parker that two thirds of the Funds—approximately $150,000—were rightfully his, but Parker refused to hand them over.
- Parker then collected the benefit of the annuities and policies and liquidated the three SunTrust accounts. On May 13, 2014, Martin sued Parker for his share of the Funds in the Circuit Court for Roanoke County, Virginia (the "State Court"). *See* Complaint, *Martin v. Parker* (State Action).
- Martin's lawsuit in the State Court dragged on for years. Martin's Second Amended Complaint in that suit, filed on October 2, 2017, pleaded one count of breach of contract and

3

one count of unjust enrichment.³ Martin alleged that Morton breached the PMA when he gave Parker the Funds. Martin further alleged that, but for Morton's breach, two thirds of the Funds would have gone to Martin, and consequently, Martin alleged, Parker was liable to Martin in that amount. *See* Second Amended Complaint ¶¶ 22–25, *Martin v. Parker* (State Action). Martin also alleged that Morton's transfer to Parker was wrongful and Parker had therefore been unjustly enriched. *Id.* at ¶¶ 27–28.

- Importantly, Martin's Second Amended Complaint only alleged that *Morton's transfers* were wrongful. Martin's lawsuit did not allege that Parker's liquidation of the Funds was independently wrongful or that the Funds were the property of Morton's estate despite Morton's prior transfer. Instead, Martin alleged that Parker had reaped the fruits of Morton's breach of the PMA.

- On September 10, 2019, more than five years after Martin's lawsuit was first filed, Martin prevailed on summary judgment. Specifically, the State Court entered a judgment finding Parker liable for $151,501, Martin's damages but for Morton's breach of the PMA (the "Roanoke Judgment"). Parker noticed her appeal to the Supreme Court of Virginia on October 7, 2019, but that appeal was never prosecuted, and Parker's notice of appeal expired on March 1, 2021. *See* Expired Notice of Appeal, *Martin v. Parker* (State Action). Parker has never made any payment to Martin on the judgment against her.

- Parker filed for Chapter 7 bankruptcy on December 24, 2021. (R.3 at 53, 110). On May 16, 2022, Martin filed a claim in Parker's bankruptcy in the amount of the Roanoke Judgment, plus interest. *See* Claim 3-1, *In re Parker*, No. 21-12073 (Bankr. E.D. Va.).

- Seeking to collect on the Roanoke Judgment in full, Martin initiated an adversary proceeding in Parker's bankruptcy on March 28, 2022. (R.1 at 9). Martin argued that the judgment (*i.e.*, a debt that Parker owed to Martin) was not dischargeable in bankruptcy because (i) Parker's debt was incurred by fraudulent misrepresentations or actual fraud; (ii) Parker's debt was the result of her fraud or defalcation, embezzlement, or larceny; and/or (iii) Parker's debt was for willful and malicious injury. *See* 11 U.S.C. §§ 523(a)(2)(A), (a)(4), (a)(6).

- The adversary matter proceeded through discovery and eventually came before the bankruptcy court for a bench trial on November 22, 2022. At trial, Parker took the stand and testified that, after speaking to her bankers, she concluded that the Funds were legally hers.⁴

---

3   Virginia law provided Martin with a cause of action for breach of the PMA because "when reciprocal testamentary provisions are made for the benefit of a third party, ... the beneficiary [may] enforce the agreement in equity." *Keith v. Lulofs*, 724 S.E.2d 695, 698 (Va. 2012) (quoting *Salley v. Burns*, 255 S.E.2d 512, 516 (Va. 1979)). Contracts to make mutual and reciprocal wills are enforceable in the same way. *See Black v. Edwards*, 445 S.E.2d 107, 109 (Va. 1994).

4   Although Parker was allowed to testify in part as to her conversations with her bankers, she was precluded from testifying to the full content of those conversations because Martin

4

- After trial, the bankruptcy court issued Findings of Fact and Conclusions of Law. Record on Appeal, Vol. 2, at 72 (Dkt. 3-3) (hereinafter "R.2"). The bankruptcy court found that Parker liquidated the Funds after she was advised by her financial institutions that she could do so "because she was a joint account holder on each of [her father's] accounts." (R.2 at 75). In the bankruptcy court's view, "[t]here was no evidence presented ... that any of the financial institutions were aware of the contents" of Morton's will or of the PMA. *Id.*

- As a matter of law, the bankruptcy court found for Parker on every count of Martin's complaint but one.[5] Specifically, the bankruptcy court found for Martin on Count II of his complaint by holding that the Roanoke Judgment constituted a non-dischargeable "debt ... for ... embezzlement." 11 U.S.C. § 523(a). The bankruptcy court defined "embezzlement" as "the fraudulent appropriation of property by a person to whom such property has been entrusted" and noted that embezzlement required "a showing of wrongful intent." (R.2 at 81). The bankruptcy court then found that Parker "came into possession of the funds lawfully, from the financial institutions, as a joint account holder," *id.* at 84, and then embezzled them when she "refused to turn the money over to [Martin] as Executor of her father's Estate." *Id.* at 82. The bankruptcy court concluded that Parker had the requisite fraudulent intent because Parker knew the terms of Morton's will. *Id.*

- Importantly, the bankruptcy court never found that Parker's testimony was not credible. Though the bankruptcy court found there was "no evidence" that any of Parker's advisors knew the contents of Morton's will or of the PMA (R.2 at 75), the bankruptcy court did not find that Parker's banks were *unaware* of Morton's will or PMA's contents. Nor did it find (or any person testify) that Parker misled the banks, whether deliberately or accidentally. Nevertheless, by equating knowledge of the will's terms with intent to defraud, the bankruptcy court concluded that the Funds had been embezzled and entered judgment against Parker.

- The bankruptcy court was clear that it found for Martin "not because of [Parker's] efforts to evade collection on [Martin]'s Judgment, or even what she did with [Martin's] money."

---

objected on hearsay grounds. Although Parker did not appeal these rulings or make this argument before the bankruptcy court, it appears that Martin's objections were improper. This is so because "[a] statement that would otherwise be hearsay may nevertheless be admissible if it is offered to prove something other than its truth." *In re C.R. Bard, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, 810 F.3d 913, 926 (4th Cir. 2016). For example, an out-of-court statement is admissible to show that statement's effect on the listener. *Graves v. Lioi*, 930 F.3d 307, 325 n.15 (4th Cir. 2019). What Parker told her bankers, and what her bankers told her, is relevant to Parker's state of mind—*i.e.*, whether Parker believed the Funds were hers or Martin's. Parker's testimony therefore could have been admitted on that basis, and Martin's objections should have been overruled.

5   The bankruptcy court rejected Martin's arguments that Parker's debt was nondischargeable due to (i) fraudulent misrepresentation or actual fraud, (ii) fiduciary defalcation, (iii) larceny, or (iv) willful or malicious injury. Martin does not appeal any of those holdings. (*See* R.2 at 96–98).

5

(R.2 at 79). Instead, it found embezzlement "because [Parker] wrongfully took [Martin's] money in the first place." *Id.* For that reason, and for that reason only, the bankruptcy court held that the judgment could not be discharged.

Parker then appealed the bankruptcy court's decision pursuant to Rule 8003, Fed. R. Bankr. P., and 28 U.S.C. § 158(a)(1). Parker argues that the judgment against her must be reversed because (1) Martin failed to plead embezzlement properly and (2) Martin's evidence was insufficient to prove embezzlement. (R.2 at 91).

## II.

The dispositive question on appeal is whether the bankruptcy court erred in finding that Martin carried his burden of proof to show Parker committed embezzlement. Put briefly, the answer to that question is "yes."[6] To support a finding of embezzlement, Martin was required to prove each of four elements: (i) fraudulent (ii) conversion of (iii) the property of another (iv) by one with lawful possession thereof. As to two of those elements, Martin did not meet his burden.

Martin did not prove the third element of embezzlement, namely, that the Funds were "the property of another." Martin did not prove the first element of embezzlement, either, because Martin did not show that Parker acted with fraudulent intent—*i.e.*, with knowledge that her use of the Funds was unauthorized. On the contrary, the record indicates that Parker was operating under a good-faith belief that she was entitled to the funds that she took. Such a belief, even if ultimately mistaken, precludes a finding of fraudulent intent. Because the bankruptcy court's finding of embezzlement rested on errors of both law and fact, the judgment against Parker must be reversed.

---

6 Because Parker prevails on this ground for appeal, there is no need to address or resolve Parker's argument that Martin did not adequately plead embezzlement.

6

### A.

Appeals in bankruptcy cases are reviewed by courts in this District in the same manner, and using the same standards, as civil appeals are reviewed by the Fourth Circuit. *See* 28 U.S.C. § 158(c)(2). In other words, while questions of law are reviewed *de novo*, questions of fact are reviewed only for clear error. *TKC Aerospace, Inc. v. Muhs (In re Muhs)*, 923 F.3d 377, 384 (4th Cir. 2019). Mixed questions of law and fact "are reviewed under a hybrid standard," reviewing the factual portion of the mixed question for clear error and "and examining *de novo* the legal conclusions derived from those facts." *Educ. Credit Mgmt. Corp. v. Frushour, (In re Frushour)*, 433 F.3d 393, 398 (4th Cir. 2005) (cleaned up). As the Fourth Circuit has explained, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Hall*, 664 F.3d 456, 462 (4th Cir. 2012) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Put another way, the bankruptcy court clearly erred if its "account of the evidence" is not "plausible in light of the record viewed in its entirety." *See id.* (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985)).

Bankruptcy courts may—and, presumptively, must—discharge debts incurred by a voluntary Chapter 7 debtor before the bankruptcy case began. 11 U.S.C. §§ 301(a), 727(b); *Kubota Tractor Corp. v. Strack (In re Strack)*, 524 F.3d 493, 497 (4th Cir. 2008). When the debt in question is a judgment for damages, discharge voids that judgment; to recover, a judgment creditor must instead file a claim in the debtor's bankruptcy. *See id.* at § 524(a)(1). But a creditor who wishes to avoid the claims procedure may rebut the presumption of dischargeability by showing that the debt to be recovered on falls into one of the Bankruptcy Code's exceptions to discharge. *See* 11 U.S.C. § 523(a). These exceptions are construed narrowly to give effect to the Bankruptcy Code's policy

of providing debtors with a fresh start. *Strack*, 524 F.3d at 497 (quoting *Foley & Lardner v. Biondo (In re Biondo)*, 180 F.3d 126, 130 (4th Cir. 1999)). One of those exceptions, codified at 11 U.S.C. § 523(a)(4), dictates that a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny" is not dischargeable. If that exception applies here—*i.e.*, if Martin's judgment against Parker is a "debt ... for ... embezzlement"—then that judgment cannot be discharged. In that event, Martin would be able to pursue Parker for the full amount of the Roanoke Judgment.

The elements of embezzlement are not stated by the Bankruptcy Code, but the offense has traditionally been defined as "the fraudulent appropriation of property by a person to whom such property has been [e]ntrusted, or into whose hands it has lawfully come." *Moore v. United States*, 160 U.S. 268, 269 (1895).[7] In other words, distilled to its essence, "the traditional concept of embezzlement" requires a (i) fraudulent (ii) conversion of (iii) the property of another (iv) by one with lawful possession thereof. *United States v. Stockton*, 788 F.2d 210, 217 (4th Cir. 1986); *see also United States v. Sampson*, 898 F.3d 270, 277 (2d Cir. 2018); 3 Wayne R. LaFave, *Substantive Criminal Law* § 19.6 (3d ed. 2017).[8]

**B.**

As the bankruptcy court acknowledged (R.2 at 77), it was Martin's burden, as the creditor in this adversary proceeding, to prove embezzlement by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). The issue at the heart of this appeal is whether Martin carried

---

7　The bankruptcy court quoted this definition of embezzlement, although it did not cite *Moore* when it did so. (R.2 at 81) (quoting *Direct Cap. Grp., LLC v. Hadley (In re Hadley)*, 2011 WL 3664609, at *12 (Bankr. E.D. Va. Aug. 19, 2011)).

8　This definition aligns with Martin's, which interprets embezzlement as comprising "(1) [a] debtor's appropriation of property for [the] debtor's benefit, and (2) appropriation with fraudulent intent or by deceit." Response Brief of the Appellee at 13 (Dkt. 6) (quoting *Dixon v. Wilkerson (In re Wilkerson)*, 644 B.R. 349, 371 (Bankr. E.D. Va. 2022)).

8

his burden. The bankruptcy court concluded that Martin did. Its analysis of Martin's embezzlement claim follows in its entirety:

> In this case, the financial institutions, knowing only that [Parker] was a joint account holder, advised her that she was entitled to liquidate the accounts. As a joint account holder, she came into the money from her father's Estate lawfully. She then refused to turn the money over to [Martin] as Executor of her father's Estate. In doing so, she exercised control and dominion over the funds, wrongfully. [Parker] had actual knowledge of the terms of her father's Will when he was still in the hospital. She testified that she retrieved a copy of the Will and brought it to the hospital. She acknowledged that [Martin] told her of the [PMA] between her father and [Peggy] Martin shortly thereafter. This conduct meets the very definition of embezzlement. Further, in knowing the terms of the Will, [Parker] had fraudulent intent in not turning the property over to [Martin] as Executor.

(R.2 at 82). In other words, the bankruptcy court's theory of embezzlement was that Parker **had lawful possession** of the Funds when she "came into the money from her father's [e]state" "[a]s a joint account holder"; that the Funds were in truth **the property of another**; that the Funds were **converted** when Parker refused to turn the Funds over to Martin on demand; and that Parker acted with **fraudulent intent** because, "in knowing the terms of [Morton's] [w]ill," Parker knew that the Funds did not belong to her.

Two elements of embezzlement—lawful possession and conversion—are undisputed. Parker came into possession of the Funds lawfully via a series of gifts from her father Morton. It is well settled that "where [a] defendant's original possession is not wrongful, conversion is complete when the rightful owner demands the return of the property and is refused." *Goodbody & Co., Inc. v. McDowell*, 530 F.2d 1129, 1151 (5th Cir. 1976) (applying Texas law); *accord* Restatement (Second) of Torts § 237 (Am. Law Inst. 1965). And there can be no question that money is a form of property that can be embezzled. Parker instead argues that the bankruptcy court erred in finding

9

that the last two elements—that the Funds were "the property of another" and that Parker had fraudulent intent when she converted them. Each of those arguments is analyzed in turn below.

## C.

Parker first argues that the Funds were not "the property of another" because, in her view, the Funds "legally passed to [Parker] outside of her father's [e]state." Appellant's Opening Brief at 19–21 (Dkt. 5).[9] Although Morton's will stated that "all the rest, residue and remainder of [Morton's] property and estate" passed pursuant to the PMA, *i.e.*, two thirds to Martin (R.1 at 95–96), Parker argues that the Funds were not part of Morton's "property and estate" upon his death because life insurance policies and joint bank accounts pass outside of probate pursuant to Virginia's law of wills and estates. Appellant's Br. at 21 (citing Va. Code § 6.2-608). Thus, in Parker's view, although taking the Funds left Parker liable in contract, the Funds themselves were not Martin's property and could not be embezzled. Martin disagrees with Parker's reading of Virginia law and further insists that these background rules are irrelevant because Martin's ownership of the Funds is resolved by Morton's will, the PMA, and the Roanoke Judgment.

### 1.

It is first necessary to address Martin's argument that the State Court already decided that the Funds were Martin's "rightful property." Appellee's Brief at 13 (Dkt. 6). Specifically, Martin argues that the bankruptcy court's judgment must be affirmed because the Roanoke Judgment held that the Funds rightfully belonged to Martin. But Martin's reliance on the Roanoke Judgment is misplaced. Martin could sue Parker in Virginia court because, as a third-party beneficiary of the PMA, he had an equitable cause of action to enforce the PMA's provisions. *Keith v. Lulofs*, 724

---

9 The bankruptcy court seems to have assumed, but did not find, that the Funds were subject to either Morton's will or the PMA.

10

S.E.2d 695, 698 (Va. 2012). Where reciprocal and irrevocable wills are made by contract, "it is important to distinguish the law of wills and the law of contracts." *Id.* at 697. Morton's transfer of the Funds was, as both parties admit, in violation of the PMA. But the PMA was a contract—no more, no less. Morton's breach of the PMA gave Martin a cause of action sounding in contract, but Morton's breach of contract did not preclude Morton from passing valid title to the Funds. To conclude, holding otherwise would conflate contract and property law and thus confuse two domains that Virginia caselaw requires be kept separate. *Id.*

Martin cannot show that Morton's transfers were void by relying on the terms of Morton's will. Such an argument is squarely foreclosed by binding Virginia caselaw. To reiterate, Morton's will provided that "all the rest, residue and remainder of [Morton's] property and estate" would pass two thirds to Martin. (R.1 at 95). At the moment Morton executed his will, the Funds were his property and therefore subject to his will's residual term. Morton's will, by its own terms, was irrevocable. (R.1 at 96). But those terms of Morton's will were not sufficient to prevent Morton from transferring the Funds to Parker before Morton's death. Such terms convey a decedent spouse's property in fee simple rather than subject to a trust. *See Salley v. Burns*, 255 S.E.2d 512, 514, 518 (Va. 1979). Thus, Morton's will did not prevent Morton from transferring the Funds to Parker, and his will's residual term did not make Morton's transfers void. Martin's proffered legal instruments—Morton's will, the PMA, and the Roanoke Judgment—have no bearing on whether title to the Funds passed outside of Morton's will. Martin's contrary argument fails.

### 2.

Because neither Morton's will nor the PMA speaks to whether the Funds were Martin's property, it is necessary to discuss the substance of Parker's arguments. Parker argues that the Funds passed outside of Morton's will because life insurance policies and joint bank accounts are

not subject to probate in Virginia. Parker is only partly correct. Parker discusses the Funds as though they were all subject to the same legal standard, but on the contrary, each of the Funds' constituent financial assets is governed by different provisions of Virginia law and must be analyzed separately. The Funds comprise (i) two annuities, (ii) one life insurance policy held with the Virginia Retirement System ("VRS"), (iii) one jointly held checking account, (iv) one jointly held certificate of deposit, and (v) one solely held certificate of deposit. Each is addressed in turn.

To begin, Parker's argument fails with respect to the two annuities and the solely held certificate of deposit. Parker argues that those portions of the Funds passed to her directly because the Funds were *inter vivos* gifts. But Virginia estate law "does not presume a gift"; instead, to overcome a will, a purported donee must prove a gift occurred by "clear and convincing evidence." *Rust v. Phillips*, 159 S.E.2d 628, 631–32 (Va. 1968); *see Knop v. Knop*, 830 S.E.2d 723, 726 (Va. 2019) (quoting and approving of *Rust*). In relevant part, Parker needed to prove that Morton intended to make a gift of the Funds to Parker. *See Ott v. L & J Holdings, LLC*, 654 S.E.2d 902, 905 (Va. 2008) ("Donative intent on the grantor's part is an essential element of a gift."). The intent to make a gift must be so "clear and unmistakable" that it is "inconsistent with any other theory." *Matthews v. Hanson*, 134 S.E. 568, 569–70 (Va. 1926). Parker presented no evidence of Morton's intent at the time of the gift. Thus, Parker did not overcome Virginia's presumption against gifts, and it must therefore be assumed that Morton intended the annuities and solely held certificate of deposit to pass pursuant to his will. Because that portion of the Funds was part of Morton's estate, it was also "property belonging to another" for purposes of embezzlement. *Stockton*, 788 F.2d at 217.

On the other hand, Parker is correct about the VRS life insurance policy. Virginia law exempts "VRS life insurance proceeds ... from attack of any kind." *Sexton v. Cornett*, 623 S.E.2d

898, 900–01 (Va. 2006) (citing Va. Code §§ 51.1-510, 124.4). Further, "[t]he designation of a person as beneficiary under a life insurance policy is a gift from the insured." *Id.* at 900 (citing *Walker v. Penick's Ex'r*, 95 S.E. 428, 431 (Va. 1918)). In *Sexton*, the decedent reassigned the benefit of his VRS policy from his wife to his children just two months before his death. *Id.* That fact, standing alone, was sufficient for the Supreme Court of Virginia to find that the benefit of the policy passed outside the decedent's estate and thus was not subject to any claim by the decedent's widow. *Id.* at 902. *Sexton* makes clear that the benefit of Morton's VRS life insurance policy passed outside of Morton's will. For that reason, Martin had no claim to it, and Parker therefore could not have embezzled it.

As to the jointly held accounts, Parker points to Va. Code § 6.2-608, which provides that joint bank accounts "belong to the surviving party [to the bank account] ... unless there is clear and convincing evidence of a different intention at the time the account is created." Appellee's Br. at 15–16 (quoting Va. Code § 6.2-608(A)) (emphasis added). That statute "reverses the common-law presumption" against survivorship rights in a joint account "unless the depositor plainly designates that the account excludes survivorship." *Higgins v. Bowdoin*, 380 S.E.2d 904, 907 (Va. 1989) (interpreting Va. Code § 6.1-125.5).[10] Martin presented no evidence of Morton's intent and therefore Martin did not rebut the presumption of survivorship.[11] Thus, the jointly held

---

10 Va. Code § 6.1-125.5 has since been recodified at § 6.2-608. *See* 2010 Va. Laws ch. 794.

11 Martin objects that Morton's will and the PMA provide clear and convincing evidence that Morton intended the Funds to pass through Morton's will. Appellee's Br. at 16. Although Martin insists that the bankruptcy court and the State Court have already decided this issue, Martin provides no record evidence that the Virginia Code section at issue in either proceeding. Further, both Morton's will and the PMA were executed before the Funds were transferred, and Martin presented no evidence that Morton intended not to create a survivorship right in the jointly held accounts *at the time the account was created*. Va. Code § 6.2-608. Martin's evidence is thus inapposite and does not alter the analysis or result reached here.

checking account and certificate of deposit[12] passed directly to Parker and did not constitute "property belonging to another" that Parker could have embezzled. *Stockton*, 788 F.2d at 217.

In sum, Parker is correct that the benefit of the VRS life insurance policy and the jointly held accounts passed outside of probate; that portion of the Funds, totaling $82,418.36, was *not* part of Morton's estate, although Parker took it subject to Martin's subsequent claim for breach of contract. But Parker's argument fails with respect to the two annuities and the solely held certificate of deposit. Accordingly, that portion of the Funds, totaling $144,849.53, *was* part of Morton's estate. Two thirds of that sum, $96,566.35, passed to Martin pursuant to Morton's will and, because it was "property belonging to another," *id.*, could therefore be embezzled by Parker. The bankruptcy court failed to distinguish the Funds that passed through Morton's will from those that did not. This was error.

### D.

The final element of embezzlement—fraudulent intent—requires "knowledge that the appropriation is contrary to the wishes of the owner of the property." *Stockton*, 788 F.2d at 216–17; *see also Sherman v. Potapov (In re Sherman)*, 603 F.3d 11, 13 (1st Cir. 2010) (Souter, J., ret.).[13] Importantly, a defendant "acting under an erroneous belief of entitlement" lacks fraudulent intent. *Miller v. J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598, 603 (5th Cir. 1998); *accord, e.g., Stockton*, 788 F.2d at 217 (a person with a "good-faith belief that the property is his own, or that the

---

12  For the purposes of § 6.2-608, a certificate of deposit is an "account." *See* Va. Code § 6.2-604.

13  This standard is consistent with Martin's argument that embezzlement requires only "an intent to convert," not an "intent to harm." Response Brief at 14 (quoting *Wilkerson*, 644 B.R. at 372). *Wilkerson*'s standard, which was first articulated in *Clark v. Taylor (In re Taylor)*, 58 B.R. 849 (Bankr. E.D. Va. 1986), serves only to distinguish the mental state element of embezzlement under 11 U.S.C. § 523(a)(4) from the mental state element of willful and malicious conversion under 11 U.S.C. § 523(a)(6). *See Taylor*, 58 B.R. at 855.

appropriation is otherwise authorized, is not guilty of embezzlement."); *Gunn v. Commonwealth*, 637 S.E.2d 324, 329 (Va. 2006) (quoting *Whitlow v. Commonwealth*, 37 S.E.2d 18, 21 (Va. 1946)).[14]

These principles, applied here, required Martin to show by a preponderance of the evidence that Parker knew the Funds were not hers. Martin did not do so; the bankruptcy court's findings of fact are insufficient to show the requisite fraudulent intent. As evidence of Parker's knowledge, both Martin and the bankruptcy court pointed to Parker's sworn testimony that she knew the terms of Morton's will. But Morton's will does not expressly mention finances, joint accounts, life insurance policies, or annuities (R.1 at 95–96), and the language of the will's residuary clause, standing alone, is insufficient to support an inference of knowledge. The residuary clause, which covered "all the rest, residue and remainder of [Morton's] property and estate, both real and personal," *id.* at 95, does not self-evidently apply to the Funds because the Funds are not self-evidently part of Morton's estate.[15] As the preceding section shows, it is far from simple for even for a well-trained lawyer to determine whether the Funds were subject to Morton's will's terms.

The record does not support an inference that Parker replicated the foregoing legal analysis by herself and chose to disregard it. Instead, it is more likely—and far more consistent with the record—that Parker did not understand how Morton's will applied to the Funds. Nothing in Parker's life experience suggests that Parker knew how to read legal texts. Parker served in the Air

---

14 Indeed, every American jurisdiction appears to recognize that "[when] property is converted under a *bona fide* claim of right, the conversion is not embezzlement." *Whitlow*, 37 S.E.2d at 21 (quoting *Wadley v. Commonwealth*, 35 S.E. 452, 455 (Va. 1900)); *see* 3 LaFave at § 19.6(f)(1) (collecting cases).

15 Put another way, knowledge of the will's *text*, standing alone, is insufficient to prove knowledge of the will's *legal effect*. *See* Lawrence B. Solum, *The Interpretation-Construction Distinction*, 27 Const. Comment. 95, 103 (2010).

Force; she was employed by U.S. Air; and until her retirement in 2020, she worked as an administrative assistant for Stafford County Schools. (R.3 at 53). That work experience is admirable, but none of it gave Parker any training in the law. In fact, Parker's unimpeached and uncontradicted testimony showed that she did *not* understand that she lacked title to the funds she liquidated.[16] Parker testified that reading Morton's will left her "confused." *Id.* at 59. That was why Parker contacted her banks to determine if she had lawful possession of the Funds. Parker told her bankers that she did not know what to do given the existence of Morton's will and the PMA, and she was told that, because Morton had given Parker the Funds while Morton was alive, "this [*i.e.*, Morton's actions] supersedes this [*i.e.*, Morton's will]." (R.3 at 59–60). Parker testified that after each conversation with her bankers, she was left with the impression that the Funds were hers. These facts, which neither Martin nor the bankruptcy court contest, support a conclusion that Parker acted with a "good-faith belief" that the Funds were hers—and thus lacked the intent necessary for embezzlement. *Stockton*, 788 F.2d at 217.

Parker's knowledge of the PMA's existence (R.2 at 74) does not alter this analysis. Importantly, Parker did not testify that she knew the PMA's *terms* when she refused to surrender the Funds to Martin. Parker admitted the key terms of the PMA in her answer to Martin's amended complaint (*see* R.1 at 26, 37), but that proves only that Parker became aware of those terms at some point before filing her answer. There was thus no evidence on the record to show that Parker was aware, at the time that Martin demanded Parker turn over the Funds to him, that the PMA prohibited Morton's transfer of the Funds to Parker. Further, even if Parker knew that Morton

---

16 Parker's account was not challenged or rebutted when she was on the stand. Significantly, the bankruptcy court never found that Parker's testimony was not credible; nor did it find that Parker's testimony should have been given little weight. Because Parker's testimony showed she lacked fraudulent intent, it was clear error for the bankruptcy court not to address it.

transferred the Funds to her in violation of the PMA, that does not amount to "knowledge that [Parker's] use [was] devoid of authorization." *Sherman*, 603 F.3d at 13. Whether Martin had a cause of action against Parker for damages is distinct from the entirely separate question of whether the Funds belonged to Martin upon Morton's death. *See supra* § II.C.1. The bankruptcy court, by eliding and erasing this distinction, erred as a matter of law. That error of law, in turn, caused the bankruptcy court to draw unwarranted inferences from its findings of fact.

The bankruptcy court did not merely draw unwarranted conclusions from its findings of fact. Some of its findings were themselves in error. For instance, the bankruptcy court found that "the financial institutions [knew] only that [Parker] was a joint account holder" when they advised Parker she could liquidate her father's accounts. (R.2 at 82). The bankruptcy court also found that Parker was advised she could liquidate the accounts "*because* [Parker] was a joint account holder on each of the accounts." (R.2 at 75) (emphasis added). Both findings were clear error. Parker's unimpeached and unrebutted testimony was that she told the financial institutions about Morton's will and the PMA, and that subsequently Parker was advised that she owned the Funds free and clear because her status as a joint account holder took precedence over Morton's will. (R.3 at 59–60). Parker's uncontradicted and unimpeached testimony was that she was confused and that she consulted her financial professionals to determine if Parker had lawful possession of the money in the accounts. (R.3 at 59, 66). This evidence falls far short of the fraudulent intent required for embezzlement. The bankruptcy court's contrary finding has no basis in the record and, therefore, was clear error.

In short, none of the evidence Martin presented and none of the facts the bankruptcy court found made it more likely than not that Parker knew the Funds did not belong to her. Indeed, because the evidence much more strongly supports an inference that Parker—acting on the advice

17

of her bankers—believed she had a right to possess the Funds, Parker likely "act[ed] under an erroneous belief of entitlement." *Miller*, 156 F.3d at 603. The evidence before the bankruptcy court *rebutted* a finding of fraudulent intent instead of proving it. Thus, Martin did not carry his burden on this element of the test for embezzlement.

### III.

A thorough review of the record below leads to one inescapable conclusion: The bankruptcy court erred by finding that Parker embezzled the Funds. Martin did not carry his burden to prove two elements of embezzlement. Martin did not show that the Funds were "the property of another" or that Parker had fraudulent intent because she knew the Funds did not belong to her. Martin proved only that (i) Parker and Martin disputed which of them was entitled to the Funds, (ii) Parker was advised she was the Funds' rightful owner, (iii) Martin later sued Parker for contract damages arising from Morton's transfer of the Funds to Parker, and (iv) Martin won his suit. Put simply, this is not "the very definition of embezzlement." (R.2 at 82). Liability on a contract does not, by itself, create a property right, and forcing a contract plaintiff to prove his claim in court is neither tort nor crime. The bankruptcy court's contrary conclusion was reversible error.

To be clear, reversing the judgment below does not leave Martin empty-handed. Martin has already filed a proof of claim for the amount of the Roanoke Judgment in Parker's bankruptcy, plus interest. Martin may therefore recover a proportional share of his judgment from Parker's bankruptcy estate. The only consequence of today's decision is to subject Martin to the orderly and ordinary operations of the Bankruptcy Code. Thus, the judgment of the Bankruptcy Court for the Eastern District of Virginia must be

**REVERSED.**

An appropriate Order will issue. The Clerk of the Court is directed to provide a copy of this Memorandum Opinion to all counsel of record, the United States Trustee, and the clerk of the bankruptcy court.

Alexandria, Virginia
September 11, 2023

_____
T. S. Ellis, III
United States District Judge